The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. May it please the Court, Hamish Hume for Appellant Blenheim Capital. Why don't you lift up the microphone onto the podium so we can hear it. Yes, thank you, Judge Niemeyer. Hamish Hume for Appellant Blenheim Capital. Your Honors, if it pleases the Court, I... Your Honors, I plan to begin with the Foreign Sovereign Immunity Issue and then address the Antitrust Issue. Plaintiff Blenheim Capital brought claims against the Republic of Korea and its Defense Acquisition Board, DAPA, based upon tortious conduct that was part of a commercial transaction with substantial contact with the United States. Under the plain text of the Foreign Sovereign Immunity Act, those claims were based upon commercial activity carried on in the United States and the Korean defendants were not immune from suit. The District Court erred in reaching the opposite conclusion because it failed to consider the specific tortious conduct the claims were based upon and the specific commercial transaction that that tortious conduct was a part of. I'd like to quickly summarize the commercial transaction and the tortious conduct because Blenheim alleges that DAPA conspired with a United States company, Lockheed Martin, to remove Blenheim from a commercial transaction to acquire a satellite that was to be delivered here in the United States and launched into orbit from here in the United States. A few quick facts about the transaction itself. How do you define commercial activity, commercial transaction? Why is it a commercial transaction? As the FSIA says in Section 1603D, it's the nature, not the purpose, that matters. As the Supreme Court said in Weltover, that means you do not look at the purpose of the transaction. You look at only the outward form of it. In Weltover, the Supreme Court said that a sales contract for goods is a commercial transaction even if it's military equipment, as the legislative history says, even if it's for a military purpose. It's the outward form that matters. The virtual defense case applied that principle to say that even the sale of MiG fighter jets capable of firing nuclear weapons is a commercial transaction, and that was cited favorably in both the Ninth Circuit and the Eleventh Circuit. The Ninth Circuit in Ministry Defense versus Cubic, these are cited in our briefs, and the Eleventh Circuit in the SAMCO case. The SAMCO case involved the acquisition of arms, munitions, and explosives, or the bailment of those military equipment. The Cubic case involved the acquisition of an armed combat. Are you arguing that the sale of the F-35s is a sovereign act? Right now, Judge Niemeyer, I'm solely focused on the satellite. I know you are, but I'm moving a little broader, and this transaction involved the sale of F-35s to Korea. Is that a commercial transaction? We've argued it is, but I want to be very clear that the court need not reach that issue. I understand that. You say it's a collateral, and it's a different nature transaction. I'm focusing now on the transaction of F-35s. You said the sale of MiGs. It seems to me the test is whether we are focusing on conduct of a sovereign, exercising its prerogatives as a sovereign. We know the old doctrine that governments can engage in commercial activity, but it seems to me that when South Korea buys F-35s, number one, only a sovereign can buy them. Number two, it's buying them for its self-defense. Number three, it's a transaction essentially between the United States and South Korea. You can't sell them except through the United States. So it seems to me those aspects make it a sovereign transaction, right? Your Honor, I think the third is the only thing different from the existing case law. Under the first two, that only a government can buy it, and that it's buying it for a military purpose. That is true of the facts in Virtual, for example, which is cited favorably in the 9th and 11th Circuit. The existing case law has applied the principle of weltover differently in the situations that involve the first two points you made. The third point, I will admit, is different and not addressed in any case except for the Simon case and the BAE District Court case. Nevertheless, and so I realize that the FMS transaction presents different issues that make it a harder case as to whether the F-35 transaction itself was commercial. But I really want to emphasize, because the critical error here and the issue we wish to focus the question on. I know you want to get off, but I want to explore just a bit why the F-35 is not commercial or is. I mean, you're saying it's not commercial, it's a sovereign transaction. No, I'm not saying that. Oh, you believe it's a commercial transaction? We've argued it is and we believe it is. Well, then it's hard for me to tell what a sovereign transaction is because South Korea was trying to improve its national defense by buying materiel that could only be supplied to it from another sovereign. The first point that they were trying to improve their defense, that goes straight to purpose. I'm 100% confident that cannot be the test. Well, tell me what the test is then. The test is simply whether the outward form of it is the same as a sales contract for the purchase of goods no matter what they are. No matter who they're sold to or from? That's correct. That just can't be the case because an exercise of its sovereignty can buy stuff necessary to act as a sovereign and solely uniquely as a sovereign. You're arguing at a general level that any contractual relationship is per se commercial. Is that what your argument is? That is the argument as to the F-35s. Anything, any transaction involving a sovereign that is contract, you're saying is commercial because contracts are inherently commercial. Yes, Your Honor. Okay. But you can reject that argument and still rule for us. I find it hard. I'm going to want to read some more. I'd rather the time be focused on the other argument. So how could we still rule for you if we reject the argument you just made? Because the satellite transaction does not involve the United States government and is not part of the FMS deal. I thought the United States had to approve it and did approve it. The United States approves all sorts of commercial transactions. I understand, but it exercised its sovereign power to approve it and did approve it, and it wouldn't have gone through without the approval of the United States nor the approval of the Korean military. That's true, but that does not take it out of the commercial activity. No, it doesn't, because your argument is that every contract is commercial. That's hard for me to think that Congress gave sovereigns immunity in our courts, except when the sovereign exercises some kind of commercial contract involved in the United States. I'm not treating the sovereigns any differently than the way the United States government as a sovereign is treated in our own courts. There are some contracts that are commercial, but there are some contracts that are sovereign. And one of the tests that helps distinguish is whether citizens in the commercial world and the commercial markets could engage in the same transaction. And clearly, the transactions we're talking about are inherently sovereign. Taxpayer money went to develop these F-35s. They've been part of the national defense and national policy. We engage countries to participate. We sell only to those countries. We approve it. And it's all for the military defense of both countries. And it sounds to me like that is the conduct of sovereign, not the conduct of a private citizen in a commercial market. Judge Niemeyer, what I would submit is there is no case that analyzes a fact pattern using that analysis. The cases say, including cases involving military equipment, that it doesn't matter what the purpose is. In the legislative history to the Foreign Sovereign Immunities Act itself, it says a sales contract is commercial even if it's for military equipment and even if it's for a military purpose. Going to war is a sovereign act. Buying equipment to help you go to war is not. The only thing that's different from the existing case law, and there is existing case law that this court would have to depart from to rule in the way you are articulating your perspective, you would have to depart from how the Seventh and the Ninth and Eleventh Circuit have ruled how they favorably cited the virtual defense case, which involved the sale of fighter jets that can fire nuclear weapons that Moldova was trying to sell to the United States as part of the end of the Cold War and giving its weapons away. That was sovereign activity. But the form of it was the sale of goods between two parties and two government parties. And the lawsuit was by a broker. That's virtual defense. Judge Urbina, 1999. No case has ever said, well, that was way out of line. Instead, they favorably cited it in both the Ninth and the Eleventh. And so, Your Honor, I think this court would be departing from those precedents if it ruled that... What about if we entered into a treaty with South Korea where we agreed to share arms? Yes. As part of that treaty, we sent F-35s to South Korea. That might be different, but on that... What makes it different? Well, first of all, I don't actually... If there was a contract for the acquisition, it might still fall under commercial activity. As part of the treaty. As part of the treaty. I would like to refer the court on that question to the Mortimer case cited on page 34 of our briefs, where the government of Germany, West Germany, entered into a treaty with the United States after World War II and assumed the debts of the regional banks around Germany that were incurred during World War II. They were later sued by people who owned those debts. And they said, well, wait a minute. This isn't commercial activity. We did this under a treaty. You can't sue us for something we did under a treaty. Judge disagreed, said you're not immune. Commercial activity. You owe money on a debt. So, I just don't think it is as simple as saying you did it through a treaty or this is a product that only a government can buy. That is not how the... What I'm getting at the bottom, if I understand your position, is that every transaction involving contracts. If a government acts torturously in carrying out its own sovereign functions, for instance, protecting its borders and it acts in negligence, then I suppose there's immunity. But if there is a contract for the sale of goods or services between two sovereigns, you're saying that is always commercial activity and the country's not immune. Is that it? What I'm really saying that I care to say most, Judge, is whether or not that's true or not. Well, you want to separate the satellite. But it is different. And brokering the satellite and interference with the brokerage arrangement. Yes, I do. I understand that. That's another issue. But that's the issue that matters. That's the only issue that matters. What makes it hard to analyze that is trying to find out the difference between sovereign immunity and commercial activity exempt from sovereign immunity. Judge, nobody has ever argued in this case that the satellite that was being bought by DAPA from Lockheed could only be bought by a government. No one has ever argued that that satellite was something that the U.S. government was involved in. They were involved in it. They approved it, didn't they? The Green Book that this court cited favorably in the BAE case says the U.S. government cannot be involved, cannot encourage an offset transaction, cannot be involved in it, cannot be a part of the contract, cannot use its funds. And it is disfavored. Look at footnote 5 of our reply brief. So the purchase of the satellite was not part of the FMS process? It depends what you mean by part of it. The purpose of it was to fulfill the offset obligation that South Korea imposed under the FMS deal. So the FMS deal is, you could say, a but-for cause of the satellite transaction. But that is not enough to take it out of commercial activity. Again, the legislative history to the FSIA says foreign aid, giving foreign aid, that's sovereign. But if you enter into a contract to acquire goods or services as part of giving foreign aid, that's commercial. Again, the case on page 34 of our brief says just because the but-for cause is a treaty or is a sovereign act, that can lead to commercial activity. The case we cited in our 28-J letter from the 11th Circuit involving the marine exploration says the same thing. There's a treaty between Florida and France, but then there's commercial activity implementing that treaty. Your Honors, DAPA had a contract. This court in worldwide DeMille, page 406 of that opinion, said, or maybe it's 604, I apologize, said, it takes only a single act, negotiating a contract or entering a contract, a single act, and you've got commercial activity. Here, DAPA entered into a contract with Lockheed, not the U.S. government, to acquire that satellite directly from Lockheed. Lockheed was to deliver that here in the United States, launch it from the United States. Blenheim was named in that contract, paragraph 129 of our complaint. And Blenheim had its own contract with Lockheed's affiliate, LMOC, here in the United States, pursuant to which it was going to earn its commission and structure Project Archer. Then, the tortious act. DAPA pressured Lockheed with a threat of negative press, paragraph 134, to abandon Project Archer. It negotiated. DAPA negotiated directly with Lockheed to change the deal. Paragraph 182 of our complaint. They came to the United States, DAPA did, to negotiate directly with Lockheed to change the satellite contract so that it would be a direct procurement from Airbus France, rather than this Project Archer multi-satellite deal that Blenheim had devised. That's commercial activity. Do I understand your bottom line complaint to be a tortious interference? Yes. And a conspiracy to commit that interference, yes. Antitrust laws, right. Does that change, in other words, the lawsuit is not breach of the transaction, but its lawsuit is that you are cut out by tortious activity? That's correct, Judge. Does that make a difference under the commercial? No, I don't think it does. Because the contracts were with these other entities, these affiliates, and Lockheed, the parent, and Airbus France, and Korea, DAPA in particular, conspired to interfere with those contracts and get rid of the financing transaction Blenheim had devised, even though it was better for Korea. And the tortious acts of interference were part of DAPA's commercial transaction with Lockheed to acquire the satellite. It negotiated an amendment to that contract, which was part of its tortious conduct, here in the United States, and it agreed to give more value to Lockheed, $500 million more in offset credits to this U.S. company, $155 million more in cash to Lockheed to pay for the full price of the satellite, because Blenheim was going to get the satellite to DAPA for less than half its price. So those are the tortious conduct that DAPA engaged in to implement the conspiracy and to get rid of Project Archer. And those actions are commercial activity with a substantial contact in the United States. The only other thing you could find is if you think those tortious conducts, and business torts in the legislative history, cited in the legislative history of the Foreign Sovereign Immunity Act, cited in the Zidane case, which we cite in our brief, says business torts are commercial activity. This case is about a business tort. And so it's commercial activity with substantial conduct, which triggers the first clause. But even if, like the district court, you think business torts cannot themselves be commercial, which I think is wrong, it's an act in connection with commercial activity with a direct effect in the United States. The direct effect meaning the payment of $155 million, the receipt of offset credits, the fact that no money was forthcoming from the United States to Blenheim, the fact that Blenheim's United States contract with LMOC was interfered with. Those are all direct effects under the third clause. Your Honors, I'm going to run out of time soon. I don't know if I'm into my— You have. You have. Okay. Then shall I—I would like to address the antitrust issue quickly, but I could do so on rebuttal. Very briefly, I just— You were peppered with a few questions, so I'll give you a little time to do that. Thank you, Chief Judge Gregory. I'll be very brief. On the statute of limitations issue, the first thing to understand—we have two basic points. One is to implement this conspiracy to oust Blenheim and Project Archer, more was required than simply terminating the contract. One thing that should be clear from the complaint, this is a factually complex deal with multiple parties and constituencies, some of whom wanted to do the deal because they knew how good it was, some of whom didn't and tried to undermine it. So they had to not only terminate Blenheim, they had to get Korea to approve the new deal and to pay a lot more money to do the new deal in ways that were really not proper. And then they had to get the U.S. government to approve it all, as Judge Niemeyer said. Those things did not happen until 2017 or later. And the complaint doesn't tell you when they happened because we don't fully know when they happened. So on the face of the complaint, you cannot dismiss this case, and it should not have been dismissed, for statute of limitations. And related to that, even on the termination itself, there's a factual dispute as to when it became effective. That can't be resolved at the motion-to-dismiss stage. And then quickly on FTAIA, I would just quickly say, there's not a lot of case law in this area. I think it's a first impression, essentially, in this court, for this court. We have two co-conspirators, Airbus and Lockheed, that sell leasing capacity and Ex-ImkA vans. One of them, Airbus, we cite in our brief, says that one of its five biggest customers is the United States government. All of the customers are governments, and one of the five biggest for Airbus is the U.S. government. It's a reasonable inference, since Lockheed's in the same business, as we allege, and is right next to the U.S. government, they're one of Lockheed's biggest customers, too. And they wanted to make sure Blenheim didn't enter that market, market for satellite leasing Ex-ImkA vans, which the U.S. government is one of the biggest customers. And we allege that that was a customer for Blenheim. And we actually have a lot of facts beyond the complaint that would show they were the main customer. And under that scenario, where you are excluding someone from coming into a market where the U.S. government is one of the biggest customers and where one of the co-conspirators is a U.S. company, that affects domestic commerce, that affects import commerce. That should be either in the import exclusion or the domestic effects exclusion. Thank you, Your Honors. Thank you, Mr. Hume. Mr. Greenwald? Mr. McLaughlin will go first, Your Honor. Okay. All right. Mr. McLaughlin's going to address the foreign carbon immunity tax. Oh, that's fine. It was just listed different, but it's fine. It's fine. Thank you, Counsel. Our apologies, but good morning, and may it please the Court. I'm Brian Tully McLaughlin. I represent Lockheed Martin. And as Mr. Greenwald said, he represents Airbus. We're going to share our time. So we have two questions of jurisdiction that bring us here today, the first, of course, being the Foreign Sovereign Immunities Act, which was the sole basis that Blenheim pled for jurisdiction in its original complaint. Upon seeing our motions to dismiss, it quickly amended to add a new cause of action that would potentially provide another jurisdictional hook. That was the antitrust claim that Mr. Greenwald will address. But I think Judge Neumeier's questions, Judge Thacker's questions were very apt in this situation. You're getting it wrong in the direction in which our questions were focused. If I understand the argument, it is that a contract for goods with a sovereign is the sovereign acting in a commercial capacity. In every case, even if it involves military goods that cannot be engaged in by the private sector. I think that's the position that's being taken. Now, the lawsuit is actually a tortious claim. It's not a breach of contract claim, but I don't know if that makes a difference. But I'm interested in your argument. Sure, it does. I want to address the FMS. I'll do that briefly, but also the argument that's being stressed here, which is that the offset is somehow separate and that that's the commercial activity. I'll focus on commercial activity first and exactly that question, Judge Neumeier. Again, the definition, the statute doesn't give us a lot of help in terms of what commercial activity is. It does say that a single transaction could meet the test, but the Supreme Court itself has said, well, we really have to look at what's going on underneath. And it is the nature of the test, and we don't dispute that. But it has to be, as counsel said, the outward form of the action that's being engaged in. It has to be the type of action that a private party could engage in. And the level of generality here that's being forwarded by Blenheim is far more than that which is supported by that. Opposing counsel says that nobody has said in this litigation that a private party couldn't purchase a satellite. It separates the two. Okay. So on the offset, I would say it's true that a private party might be able to purchase a satellite. South Korea could potentially go out and purchase a satellite, but that's not the nature of the transaction here. And so we have an attempt to distinguish that from the FMS transaction. Those things are inextricably intertwined, and here's why. When South Korea wants to purchase defense articles, it has to go to the government. And as your honors pointed out, here we have a foreign military sale, not a direct commercial sale. In a direct commercial sale, the defense articles could be purchased directly from Lockheed, from South Korea and Lockheed contracted together. A sovereign can engage in commercial activity that is not inherent in sovereignty, right? It can. So how do we – and I understand you're pointing out that it's the degree of specificity, the generality. What guiding principles do we use to determine whether it's sovereign or commercial? The principle is whether the sovereign is exercising only a power that private parties could exercise. Here that's not the case because a foreign military sale by definition is limited to sovereigns as the contracting parties. And this was even more that case because this had been designated as a transaction that could only be a foreign military sale. In other words, the transaction here could not have been alternatively a direct commercial sale. So only sovereigns could engage in it. How does your definition square with Weltover's, Supreme Court in Weltover, which said clearly that the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. It says that that's not the test. How does that square with that language in Weltover? It squares because they still have to look at what the nature of it is. And so I agree, the fact that – The nature of it is the selling goods. It says right here, it's not whether their objective is uniquely sovereign objectives. That's the question. You're now talking about the sovereign objective, but Supreme Court clearly said in Weltover, no, that's not the test whether that's the objective. The question is the nature of what it is. It's a commercial transaction. It's selling goods. Sure. I'm not talking about the objective, Your Honor. I'm talking about the nature of it. The form here is a transaction that only sovereigns can enter into. And what makes that different is that even in Weltover, yes, there we had bonds. And what the Supreme Court looked at in Weltover was whether there was something about those bonds that made them other than garden variety debt instruments. That was the holding. And they looked and they looked and they didn't find anything. But they conducted the analysis. And that's the point here. Here we don't have a transaction that has any of the normal ties of a transaction that a private party could enter into. This one, again, is limited only to sovereigns. A private party couldn't buy a satellite? If we go to the satellite, a private party could buy a satellite. But this type of transaction is not that. Here a satellite is not being purchased. It's part of an offset to the foreign military sale. And an offset is something that a purchaser, the foreign sovereign, requires as a condition of entering into the foreign military sale. Blenheim, in its amended complaint, concedes that those things are intertwined. They go together. And we have paragraph after paragraph in the amended complaint, paragraphs 27, 28, 34, 35 that talk about that. But let me read you one other thing. Because this is important, there's a lot of talk about the money and how that's exchanged. So the prime contractor is permitted to recover all costs for offsets from the U.S. government, which in turn bills the foreign purchaser. In other words, in the FMS context, all monetary transactions flow through the Pentagon. I just read you a quote from paragraph 46 of the amended complaint. That's in their complaint. So they recognize that all costs for this transaction for the offset, for the satellite, go through the FMS. And the Green Book, which they cite, also recognizes that, albeit on pages that they did not point out, pages 921 and 922. It says offset costs are actually included in the line item costing of the FMS purchase. In other words, South Korea can't go sue Lockheed about the purchase price or the cost for the offset. It has to go through the U.S. government if it has that kind of an issue. That makes this completely different from someone, whether it's South Korea or a private party, going out into the marketplace to say we're going to buy a satellite transaction. So it's a completely different type of transaction. And again, the Supreme Court cases, if you look at them carefully, some of them lead to a finding of commercial activity, but it's not at that level of generality. I'd point out another case, UNC Lear, which was relied on by Blenheim. And in that case, there was a finding of some level of commercial activity, but that had to do with a transaction directly with a private company. But there was also a contract for services that was a contract for security services for head of state. And the court there said that is not a commercial activity. So it's, again, the level of generality, the nature of the transaction, and whether that is a sovereign one. The transaction did not include F-35s, but rather involved corn. And it was a set-off transaction where a satellite was provided in order to induce South Korea to buy corn. We had a surplus of corn. Would your argument be the same? I would say that that might be different because I don't think we'd be talking about a foreign military sale. So if South Korea wants to buy some corn and it's going to do it from a private party, or perhaps it's going to do it from the U.S. government, that might be very different. That, of course, is not the case here. Is your argument that anything that constitutes statutorily a foreign military sale involves sovereignty of the country? It does, and particularly in this case where, by presidential direction, these defense articles were dictated that it had to be foreign military sale only. That is the only way that these articles could be sold, which is why this is a narrow case. This is not one where we're saying every type of transaction that involves two sovereigns is necessarily not commercial. We recognize there was a case cited by counsel last night in their brief where a sovereign entered into a services contract with a state, Florida, I think it was, that had to do with global marine excavation. It has nothing to do with something that is a – it's not something that a private party couldn't transact for. Completely different. Here, there is no private party in the world that could enter a direct transaction with South Korea to sell these products. Again, the offset is not different from that. It's incorporated into the foreign military sale. Again, there's no privy of contract in that way between South Korea and Lockheed Martin, as there might be in a direct commercial sale, which this court actually discussed in the BAE case several years ago, although it wasn't reaching that issue. But it discussed the very different contours of a foreign military sale versus a commercial sale. Did this turn on the objective of the sovereign or just because it's military equipment? It doesn't turn on the objective. That sounds more like what's the purpose of it. It turns on the question of, is this a type of action that a – is this action something that a private party could engage in as the direct – could a private party sell these products to South Korea? Could South Korea obtain them from a private party directly? And that's the test there. You cannot remove the U.S. government from this. Well, that's the test. And going back to Judge Neumann's corn and that hypothetical, it was a point where corn was such that the markets were such that it became a strategic product internationally. And the government said, the United States said, look, nobody's going to be able to sell corn into a foreign market without our permission. And then there was a contract to buy – sell corn to a foreign sovereign. Then that would be included, right? It's – I think if we were in that context, it might be a difficult question, although I think here – You said because a private party can't sell corn because that's what the government said. No, corn is such that it becomes strategic to our economic, you know, stability that we only do it. Well, I think there's a little bit of another difference there is that do we have that nowhere in the world private parties can sell each other corn? You know, can two people out on the street sell corn to each other? That's very different. Here we're talking about something that absolutely nowhere in the world and between no parties other than from the U.S. government can this type of product be sold. If we had that with corn, then I would say yes. It's not – Because you said nowhere in the world it could be sold. You said that's a test? Did you say that? The question is whether a private party could sell the corn. And you said nowhere in the world what? I believe I said that. Are we talking about that nowhere in the world could private parties engage in a transaction related to corn? Because you're saying that nowhere in the world could private parties engage in a transaction related to fighter jets. Yes, Your Honor. Thank you. Okay, I think that's what I was understanding. Yes. And I wanted to address the virtual case, the Moldova case. That's a very different transaction. It is between sovereigns. And again, we're not saying that it's a blanket rule that just because there's sovereigns involved that that's the only thing that matters. It does matter, though. And in that case, we didn't have an FMS transaction. We had a country, Moldova, who had hired an individual as an agent to try to sell the MIGs that they had, and they wanted to sell it somewhere. They wanted to sell it to Iran. They wanted to sell it somewhere into the United States, maybe to a public party, maybe to a private party. That was the real focus of that case. But we didn't have any kind of limitation on to whom they could sell those. Let me ask you this. There's something intangible that's gnawing at me, and I'm not sure it's appropriate. If I understand, and I don't know if the record shows this, the F-35s were developed by the United States and several other foreign nations who contributed financially to it. And that was limited as a matter of foreign policy. As a matter of fact, Turkey was part of that, and then we excluded them from the program as a matter of foreign policy. Korea is part of that program and is one of the few countries that can get F-35s. This is what I understand from the public press, and I don't know if it's in the record or not. If the F-35 is an instrument of foreign policy, not only limited to military, but limited to particular countries, and there are only a few in the world, does that make a difference? I think it does, and that is at the heart of – again, it's not the only thing we need, but that's very critical here. This transaction is subject to all kinds of foreign policy and presidential directives, and that's what makes it the type of transaction it is. That's why the government says this will only go through the U.S. government. No one else will be allowed to sell this for all the reasons that Your Honor just said. Well, when you go down that rabbit hole, then basically there's no limitation at all. I mean, foreign policy is involved in a lot of things. For example, dumping rice in other countries, excess rice in other countries. It's a question in terms of, you know, what policy we have in terms of impacting other countries' economies. There's always some policy, foreign policy. I mean, that's – again, you're getting very far from Weldover's direct – it's not about the objectives. This thing is just spanning out. It has policy involved and those type things, and which country it is, and maybe it was another country. This is really commercial activity. Commercial activity, and it seems to me that some of the cases you cited, it's different. This is not involving personnel and those type things, nor the active protection of the country and those type things. We look at what the nature of it is, and the nature is commercial, and these are private companies. Lockheed is a private company, isn't it? Stockholders? Yes, Your Honor. Is that right? Right? Lockheed's a private company. Right, and Airbus is private. They're private, but I think Your Honor is not looking at this transaction the right way. The transaction – I'm not looking at what the right way? The transaction, Your Honor. The sale here – Yes, excuse me. I agree. Lockheed is a private company. I wanted to make a further point. Well, make your further point. I thought you were going to say, I'm not looking at something the right way. Go ahead. What I wanted to say there, Your Honor, is that the fact that Lockheed is a private company and that Airbus is a private company is not something that impacts the nature of this foreign military sale because the sale is between the U.S. government and South Korea, and it cannot be otherwise. Yes, fair enough. That's correct. But you're still talking about the question, is it – What I mean is, what is your best case for your position in a Supreme Court case? I think Weltover is just fine. You think so? All right, good. I'm going to have to make sure. For a Supreme Court case on commercial activity. But I would also say, if I may have just a moment to address the other points, I know that I'm over time. Even if there is commercial activity, we then need to go to a second fundamental question, and that is, is the suit, the gravamen of the suit, based upon that commercial activity? And there, the Sachs case, the Supreme Court's case in Sachs, is essential to our case, so very important case. And so Sachs says that you must look at the particular conduct that constitutes the gravamen of the suit, the acts that actually injured the plaintiff. And this court in France.com said that. So that is – it was made clear that activities that lead to the conduct that eventually injured the plaintiff, that doesn't qualify. So here, what is the basis of this suit? It is, as Your Honor pointed out, Judge Niemeyer, it's a tortious interference with contract suit. So the allegation is that South Korea, as well as Lockheed and Airbus, tortiously interfered with Blenheim's contracts with Lockheed and Airbus regarding the procurement of a military satellite and commercial satellites that Blenheim hoped to gain. That is the nature of the suit. So the fact that we have a foreign military sale and even an offset transaction as part of it with South Korea and the U.S. government, that may be along the road to their claims, but their claims are focused on the interference in their contracts with Lockheed and Airbus. So the basis of the suit is not the foreign military sale. Proof of the foreign military sale or proof of the offset transaction is not at the heart of their case. It's not going to prove their case. The proof is, what was the interfering activity? And all of that activity occurred outside the U.S. And the Jams, another important case, Supreme Court, Jams said that when we're talking about tortious activity abroad, then it's not related to the commercial activity carried on in the United States. That's a fundamental principle here. So what was that activity? That activity is we have contracts with Blenheim, and it is a foreign company. It expects to get paid where it is, which is in the Channel Islands, not in the United States. When its contracts were terminated, that's the harm that they're talking about here. So they're proving that. That's something they didn't get paid. They got cut out of the deal. That occurs outside the United States, but it's not— They're alleging conspiracy out there. They do. And you say the conspiracy is cabin to foreign soil, as they're alleging? The basis of the suit is tortious activity. And so— Conspiracy is broad, isn't it? In other words, you're saying the conspiracy is cabin to foreign soil? Just because people signed the contract where they signed it? Conspiracy is pretty broad, isn't it? I think the point I'm trying to make, Your Honor, is that the conspiracy, tortious conduct, has to do with Blenheim's contracts. It doesn't have to do with the offset agreements or the FMS deal. So focusing on the FMS, that's not the basis of their claims. The basis of their claims is that their contracts with Lockheed and Airbus were interfered with. And so that is separate from the commercial activity that we've been talking about for some time now. I'd also mention there was a point made about— But the vehicle through which they were interfered with was this transaction, wasn't it? By getting them out of this transaction. As they allege, obviously, the trial can determine differently, but as they allege, it said that this transaction was the vehicle which they used to do that. Like, we cut them out of this deal, they'll cut them off their knees and they can't— Well, and that's clear against us later. I mean, that's what they're alleging. That's the point I'm trying to make, Your Honor, which is that what is the this transaction? What Blenheim was cut out of was not the offset transaction. They're not a party to the offset transaction. They are not in there. The transaction they were cut out of was they had a contract with Lockheed Martin and they had a contract with Airbus. So their allegation is we were cut out of those contracts and we didn't get paid on them and we didn't have an opportunity to get commercial satellites that we expected to gain from the contract that we had with Airbus and Lockheed. This is not about the proof of whether the offset transaction that's part of the FMS is— I would also mention that there's this point about, and this really goes more to, is there a direct effect of that tortious activity in the United States? And this is my last point. And here the case is circuit after circuit, and we pointed some of them out in our brief, but they look at where did the real harm occur and what was that immediate impact? That's what Weltover said, by the way. They said a direct effect has to be an immediate consequence of the tortious conduct. And here, what is that direct effect? Well, it's quite obvious when you look at the amended complaint, it's just been presented differently on appeal. The direct effect is the fact that Blenheim was, as they say, cut out of their contracts. They were no longer getting paid. That is an immediate impact of the tortious activity that they are talking about. What they're focused on now is, well, we have a potential direct effect in the United States because we alleged that South Korea was going to give additional offset credits to Lockheed Martin. First of all, I'd point out that their allegation on that, and it's paragraph 136 in the amended complaint, JA101. The allegation is DAPA began discussions with Lockheed about providing an additional $500 million in offset credits if Lockheed restarted the military satellite project as a direct procurement. So as most they have is an assertion that there was a discussion. That's it. But I would also challenge the idea of offset credits as a direct effect of being terminated from a contract with Airbus, being terminated from a contract with Lockheed. That's simply not a direct effect, and Weltover made that clear, and the other circuits have said it too. If we're trailing down the line and other intervening things are coming in, we're not in the direct effect land. The direct effect is that they were cut out of the deal. They didn't get the money they want. That's what they're seeking in this lawsuit. We want millions, hundreds of millions of dollars because that was the direct effect of this tortious activity. So that is not something that occurred in the United States. They're not a U.S. company. They're a foreign one. So that effect occurred outside. And with that, if there's no further questions, I'll turn the microphone off. All right. Mr. Greenwald. Thank you, Your Honor. May it please the Court. Thinking back to the procedural posture in this case, this case was brought by Blenheim in the eastern district of Virginia. Airbus, our client, is a French company. Lockheed is not a Virginia company. It's a Maryland company. Korea is obviously not a Virginia company. The reason that Blenheim pled, and the district court didn't even reach this because the district court found it didn't have subject matter jurisdiction, so it didn't even reach the personal jurisdiction arguments, but the nexus that they claimed was the foreign military sale and the approval of the Pentagon. And that's why this case is about a sovereign act and a sovereign-to-sovereign transaction, including the offset transaction. They're saying we should be in eastern district of Virginia because this case involves the Pentagon. But when it involves the Pentagon, it has to be a sovereign-to-sovereign act with Korea, including the sale of the military satellite. And the military satellite was paid for by Korea to the Pentagon and the Pentagon gives the money to Lockheed. And if Korea gets a clunker of a satellite, which thankfully Airbus did not do a clunker but a good satellite, but if there had been a clunker and Korea was unhappy, Korea couldn't sue Lockheed or Airbus. Korea could only go to the Pentagon. And if Korea didn't pay, Lockheed could only go to the Pentagon. This is not commercial activity. Only if corn were completely nationalized and farmers who wanted to export could sell to the Department of Agriculture and then the Department of Agriculture sold overseas, then that would not be commercial activity either. So commercial activity here doesn't occur because the Pentagon is the intermediary in the offset transaction. The money flows through the Pentagon and any claim. Is there any argument that even a commercial type of contract between two sovereigns is covered by the Immunity Act? It depends on the nature of the contract, but if it's the kind of contract that only two sovereigns can enter into, like a foreign military sale, yes. But if it's a general commercial contract, if the state of Virginia's tourism office… What if we provide foreign aid to Ethiopia in kind? Our government goes into the commercial market in the United States, buys food supplies, and then ships them free to Ethiopia to help the people. Is that a transaction covered by immunity? I didn't hear Ethiopia's involvement in that. Say it's corn again. They donate the corn to Ethiopia for distribution to the people. That does not sound like a commercial contract. That is a sovereign-to-sovereign action. That's my question. If it's sovereign-to-sovereign, your position is that it's always under the Act. Sovereign-to-sovereign of the kind that only sovereigns can do, which includes foreign policy donations, like the type Your Honor just described. If it involves general commercial activities that sovereigns also engage in, such as tourism or providing various services of their departments, that would be different. But a foreign military sale is an only sovereign activity, and the U.S. government says, we will decide which countries we're going to sell to, and we're not going to sell to people. We're not going to sell to companies. We're only going to sell to sovereigns. That's foreign military sales. In foreign military sales, FMS transactions go through the Pentagon, which is why they brought this case in the Eastern District of Virginia, where none of the defendants are located, because of its nature as a foreign military sale in the Eastern District of Virginia, which includes where the satellite is paid for. A lawsuit is a tort action. It's not breach of a commercial transaction. It's a tort action involving a commercial transaction, let's say. And the tort is committed by a foreign sovereign. Is that action subject to the Act of Immunity? Well, there's an – if we would have to look at the tort exception to the Foreign Sovereign Immunities Act, this is a tort action. That's the claim. Well, I understand, but I'm talking in generalities now. I'm just talking the scope of the immunity statute. If the tort is related to a sovereign-to-sovereign foreign military sale transaction, then it is not based on a commercial transaction, and therefore the immunity is not waived. Categorically, if the dealings are sovereign-to-sovereign, they're protected with immunity. With – of the type that only sovereigns can enter into, like a foreign military sale. Yes, Your Honor. Well, sovereign-to-sovereign. Nobody else can enter into sovereign-to-sovereign. I don't care what it is if it's a sovereign-to-sovereign, right? Except when sovereigns offer services that they also offer that they compete with private companies, such as not in foreign military sales, but such as providing services like tourism services, that may be different. Sovereigns engage in purely commercial acts that are not the kinds of things only sovereigns can do, but foreign military sales are the kinds of things only sovereigns can do. In the United States and Korea, the United States said, we will choose which sovereigns and only sovereigns can enter into this kind of transaction with us, the United States. And that's this case. That's this military satellite. And that's why this is not – there's no waiver of sovereign immunity, and they're out on that. And then I want to – I do want to turn to the antitrust claims. Paragraph 13 of the amended complaint says that this is their pleading, and the district court can look at their pleading and determine they haven't met the statute of limitations. It says that the defendants cut Blenheim out of the deal in late 2016. Paragraph 146 of the amended complaint on appendix 103 said that in October 2016, Lockheed gave Blenheim formal notice of immediate termination in a refusal-to-deal case when the plaintiff finds out that they're being refused to deal. They're not going to get the two commercial satellites, which is what they're complaining about. What they say the antitrust conspiracy, their cause of action accrued in October 2016 when they got formal notice of immediate termination, and nothing that happened after. Lockheed never said, oh, we'll reconsider. Now, Blenheim may have said, hey, we'd love you to reconsider, but that doesn't change their allegations. All the elements of an antitrust claim, an alleged antitrust claim, are met when they are cut out of the deal in 2016. They don't bring even their non-antitrust complaint until December 31, 2020. They are outside the four years, and they're out of court. This court does not need to reach the FTAIA because the statute of limitations is clear from the face of the complaint as the district court found, and that is enough to dismiss it, and therefore there's no subject matter jurisdiction based on that federal question. But if this court does reach the FTAIA, a poorly written statute, but there is no exception to this foreign deal that brings this conduct within the alleged conduct within the Sherman Act. There are two exceptions to the FTAIA, conduct involving import trade, but the refusal to provide two commercial satellites built in France by a French company delivered to an English company for them to enter the English satellite market, the satellites, that does not involve import trade, and the exception is not affecting import trade. It's involving, and there's no case where the refusal to provide foreign goods can meet the exception, and the BioCAD case is clear that their intention to enter the U.S. market is not enough to meet that exception. The other exception, the domestic effect, requires direct, substantial, and reasonably foreseeable effect on U.S. commerce. Here, the number of steps, the proximate steps that they allege they needed to enter into, they were in negotiations with Malaysia. They didn't have a contract with Malaysia to use that orbital slot. They were in negotiations with a bank for financing. They were in negotiations with an unnamed provider to provide global coverage, and then they claim they would have, after those negotiations happened, provided satellite coverage in a certain band that they say there's one reference to U.S. agencies. They don't allege a market. We don't know anything about the interchangeability of the products or the elasticity of that particular market. We know nothing, and there is nothing in their complaint that pleads direct, substantial, and reasonably foreseeable domestic effects, and therefore they don't qualify under that exception either. I see I'm out of time, and unless the Court has any questions, we'll rest on our briefs. All right. Thank you, Mr. Greenwald. Mr. Hume, you have time reserved. Thank you, Chief Judge Gregory. On the Foreign Sovereign Immunity Act, counsel said there was no privative contract between DAPA or South Korea and Lockheed. That's just plainly false. He may have misspoken. That's just plainly false. Paragraph 7 and 61 of our complaint talk about that contract. Paragraph 129 talks about how Blenheim was put into the contract as Lockheed's financial partner because Blenheim was doing the financing for that satellite acquisition. Paragraph 182 of our complaint talks about how DAPA came to the United States to amend that contract with Lockheed about the satellite acquisition to make it a direct procurement from Airbus rather than the Project Archer procurement with Blenheim, cutting Blenheim out of the deal. An atrocious act taken in furtherance of the conspiracy to cut Blenheim from the deal. Second, the foreign sovereign immunity issue does seem to come down to this question of the relationship of the offset to the FMS. The Court believes that it is or likely or might be that the FMS transaction is sovereign. That doesn't anywhere near resolve the issue because this case is about tortuous activity to interfere with the financing transaction that was supporting the offset transaction. It's two steps removed from the FMS transaction. Blenheim had devised a financing structure. It was approved by the relevant parties to provide for the acquisition of the satellite that Lockheed would provide to Korea pursuant to a contract that was only between Korea and Lockheed that was then itself connected to and designed to help further the FMS transaction. Two steps removed. Further, the fact, whether you call it inextricably intertwined or connected to or designed to further whatever it is, the relationship of the satellite transaction and the financing of that satellite transaction which is really the issue to a sovereign what we will assume for purposes of argument was a sovereign act of the FMS even if it's inextricably intertwined and done entirely to service that. The peace law is crystal clear that that doesn't make the downstream related transaction noncommercial. Four quick examples. Weltover. They issued bonods as part of a political effort to manage a severe domestic crisis involving foreign exchange in Argentina and they restructured it by presidential decree and they got no consideration and the Supreme Court said we don't care. It's a bond. Maybe you didn't get consideration. You don't have to. It's still commercial. Maybe it was done to help with this crisis. We don't care. It's commercial. It's the outward form that matters. Two, virtual. Defendants have never argued that virtual was wrongly decided. It's government to government. It's the sale of big fighter jets. No private party can acquire that. Big fighter jets that sell nuclear weapons. Here's what the facts were in the first paragraph of virtual. Following the dissolution of the Union of Soviet Socialist Republics, Moldova emerged as a sovereign nation facing severe economic turmoil. In an effort to bolster its weakening economy, Moldova arranged to sell to Iran several MiG-29 planes which were capable of firing nuclear weapons. The United States of America strongly opposed this sale on grounds of international security and in early 1997 requested that Moldova cancel the scheduled transfer to Iran. Moldova agreed to comply. That's sovereign activity of the highest order, Judge Niemeyer. That's the kind of thing that all your questions were focused on. And Judge Urbina said, yeah, but it's a sale of goods. And this broker was cut out of the deal. Sound familiar? That's what this case is. So that's commercial activity. They've never said it was wrongly decided. Never, including today. And the 9th Circuit and 11th Circuit cited it favorably. This court should too. Third example, the Mortimer case cited on page 34 of our brief. West Germany enters into a treaty with the United States. Sovereign act. We assume the debt of all these banks. Okay. Years later, they're sued. Hey, you owe us money. What? We entered into a treaty, not commercial activity. Court says, no, no, no, no. You have a bond. That's the type of thing private parties do. Reliable. Fourth example, our 28-J letter of the 11th Circuit in the marine exploration case. Sovereign to sovereign conduct on things that only sovereigns can do. That phrase you kept hearing from counsel. Sovereign to sovereign activity. Only governments can do it. That's what happened in that marine exploration case. France was trying to exercise its patrimony laws to claim a 16th century military ship sunk in the territorial waters off Florida. Two sovereigns got together and made a deal as to who was going to get that ship. That's sovereign conduct. But then the company that was trying to do the exploration on a commercial basis says, well, wait a minute. I have prior rights. And they have tortious interference claims. They had unjust enrichment claims. Those were allowed to go forward, commercial activity. So the inextricably intertwined. And finally, it's really a little too simple to say it's inextricably intertwined without taking cognizance of what the United States Department of Defense itself says. In the Green Book, it says that an offset is discharged by the United States. It is an international business arrangement. That's what the United States government calls the satellite transaction. An international business arrangement that is strictly between the purchasing, the purchaser, and the U.S. defense contractor. That's on page four of our reply brief. Your complaint seems to suggest that this involved the Department of Defense, that they approved it. They approved only because. And received the money, and that it was an integral, necessary part of the transaction to complete. There's no question. And so it seems to me that it became part of the foreign sales, military sales, integrally involved. And it would not have occurred but for that. And the United States was very much involved. I mean, your complaint makes those allegations. Your Honor, our complaint doesn't make any allegations that are inconsistent with the Green Book. And the Green Book is united. I didn't suggest that it did. What I'm suggesting is what I just related. Yes, but I think, I disagree, sorry, Judge Niemeyer. Our complaint alleged that it was connected to the FMS transaction. It was designed to further the FMS transaction. Its purpose, the purpose, the whole purpose of the, well, not the whole purpose, but the purpose of the offset transaction was to further the FMS transaction and give Korea a satellite that it needed. But purpose isn't the issue. Your Honor, you can call it purpose. You can also call it structure. The structure of the transaction was the transfer of a military satellite and F-35 to Korea in exchange for money and to the United States, payable to the United States. And pursuant to not only a foreign military sale, but probably the most sensitive military type of development. I mean, the F-35, I think, is our most recent jet, isn't it? I assume it is. It's not more sensitive, in my view, than the MiG-29s and that can fire nuclear weapons, Your Honor. Well, who can fire weapons? That's not the issue. That's right. Nor is the issue. Your Honor, I'd like to address what the counsel said about direct effects not being in the United States. There were lots of direct effects in the United States of this tortious conduct. The offset, the $500 million of offset was provided to Lockheed that benefited a United States company right here in the United States. The cash, the extra $155 million that Lockheed got from the revised deal improperly, I might add. That's referenced in paragraph 84. That's paid to Lockheed here in the United States, a direct effect of the tortious conduct, itself part of the tortious conduct. The tortious conduct, we allege, interfered with the United States contract that LMOC, the Lockheed sub, had with our client. That's the contract that was interfered with. It's a contract entered into by a United States company that chooses Maryland law. The LMOC contract was interfered with. There was no money coming out of the United States to Blenheim. Remember, Weltover was a third clause exception case, a third exception case, and the only connection to the United States, the borrowers were foreign and the lender, Argentina, was foreign. There were five places you could select for payment all around the world. After Argentina defaulted and through presidential decrees that were not paying on time were restructuring, the plaintiffs, presumably for litigation strategy reasons, said, oh, we don't accept your restructure. We're choosing New York for payment, and then they sued when Argentina didn't pay. That was the only connection to the United States. The Supreme Court said that's a direct effect. We got lots more than that here, lots more. No money coming out of the U.S., interfering with the U.S. contract, money coming into the U.S., all things that only happened because of the tortious conduct. And the Exxon case from Judge Meda has a great survey of the case law here and shows from that case law that the direct effect does not have to be a legally significant act. They keep focusing on, oh, but the injured party was Blenheim over in Guernsey or the U.K. That doesn't matter. The statute doesn't say all the direct effects have to be in the United States, and it doesn't say the legally significant gravamen of the injury of the plaintiff. To the contrary, the case law says don't look at injury. The Cruz Connections case from the D.C. Circuit explicitly says that. You don't look at where the injury was for the direct effects. Just look at what the immediate direct effects were of the conduct. And here I've given you many that were in the United States. Quickly moving to antitrust, Your Honors, statute of limitations, paragraph 13 counsel read, but he didn't read all of it. He talked about how there were terminations in 2016, yes, but he doesn't say that after that the defendants worked in concert to further the conspiracy, worked in concert to secure necessary U.S. government approvals to alter the offset transaction that Blenheim had designed, and then proceeded with the transaction without Blenheim in July 2020. That's what we alleged. We alleged it took a long time for them to do this, and there was every chance they would come back to us if it didn't work, if South Korea and the U.S. government didn't approve the revised deal. And I do want to make clear, this is an antitrust claim we're talking about. It can't accrue until we've been blocked out of the market. And we can only go to court and say we were excluded from the market if we know enough to know that the deal we structured would have happened. And to know that, we have to know that Korea went through with the deal. We didn't know that until July 2020. There may have been facts earlier after 2017 where it all crystallized and was going to happen. So it's way after 2016 that the facts occurred, and it's not evident on the face of the complaint. We need discovery to know when all these pieces were put together. We didn't know until July 2020 that the deal would have happened, and we would have been able to enter that satellite leasing market if we hadn't been cut out. Very quickly on the FTAIA, I'll just go back. Counsel did not really address my point. You have two defendants who are in a market for selling satellite capacity. The customers in that market are only governments. It's highly secure. And one of the biggest customers, the record shows, is the U.S. government. They wanted to exclude the plaintiff from that market. The plaintiff had plans to enter that U.S. market. That cannot possibly be precluded under the FTAIA. Your Honors, if there are no more questions, I appreciate your time. All right. Thank you, Mr. Hume, and thank you all, Counsel. We appreciate you being here. We can't come down and greet you as we would like to do in our normal fashion, but know very much that we appreciate your being here and your arguments. Be safe. Take care. Thank you.
judges: Roger L. Gregory, Paul V. Niemeyer, Stephanie D. Thacker